**TOOKE et al. v. MUSLOW OIL CO. et al.**

**No. 5691.**

Court of Appeal of Louisiana. Second Circuit.

June 30, 1938.

Rehearing Denied July 15, 1938.

E. W. & P. N. Browne, of Shreveport, for appellants.

Charles E. Tooke, Jr., of Shreveport, for appellees.

TALIAFERRO, Judge.

Caspar A. Tooke, plaintiff, was run down by a Chevrolet coupé driven by A. J. Stone, agent and émployee of the Muslow Oil Company, Inc., on Marshall street in the City of Shreveport, Louisiana, immediately south of the intersection thereof with Milam street, and suffered serious physical injuries from the impact. He sues to recover damages therefor.

Said streets intersect at right angles and each measures 40 feet between curbs. For the purposes of this opinion, we shall assume that Marshall street runs north and south, and that Milam street runs east and west, although, according to the compass, neither points precisely in said directions. The intersection is in the heart of the business district of the city, and traffic thereover and thereabout is quite heavy; probably as much so as at any intersection of the city. Mr. Tooke was crossing Marshall street from a point near the southeast corner of the intersection. He was struck by the coupé when he had traversed about half the distance, or 20 feet. The coupé was traveling northerly on Marshall street. The accident occurred at 4:30 o'clock of the afternoon of June 23, 1936.

Tooke assigned to Charles E. Tooke, Jr., attorney, as compensation for professional services to be rendered in filing and prosecuting this suit, one-half interest in and to any and all sums of money recovered as damages for his injuries; and assigned to Guthrie H. Pierson, "for monies advanced to defray medical and other expenses", one-fourth interest therein. Suit was instituted in the names of all three parties.

Six specific acts of negligence are charged to Stone as being responsible for and, combined, the sole cause of the accident. However, here these have been reduced to four, viz: (1) That he was not maintaining a proper lookout for pedestrians crossing the street; (2) that he did not have his car under proper control; and that if he had maintained such control, the accident would not have occurred; (3) that he was driving at an unlawful and excessive rate of speed, which was an actual and proximate cause of the accident; and (4) that he violated traffic laws in entering the intersection immediately after the overhead traffic light changed from red (stop) to green (go) without allowing time or opportunity for pedestrians therein to complete their journey across same.

Stone, the Muslow Oil Company, Inc., and its alleged public liability insurance carriers, United States Guarantee Company and Alliance Assurance Company, were made defendants. They deny that the accident was caused by any act of negligence on the part of Stone; and, in the alternative, accredit to Tooke's own negligence sole responsibility therefor. The basis of the plea of contributory negligence consists of alleged facts which we here epitome from the joint answer; that immediately prior to the accident a trolley bus had driven up to and had stopped at the southeastern corner of said intersection, and that Tooke started across Marshall street in front of said bus, turned back, but before reaching the east curb, turned again and started across the street in front of the bus; that as he emerged from the front of the bus, the car driven by Stone had reached a position only a few feet from him, rendering it impossible for Stone to stop his car in time to prevent the collision; that at the time and immediately prior thereto Stone was driving his car at a reasonable rate of speed, in a safe and prudent manner, and as soon as he realized a collision was imminent, he applied the brakes and did all in his power to avoid it. Defendants further aver that Tooke's eyesight is extremely defective, and charge that to this impairment of vision may be accredited his vacillating and indecisive action when trying to cross the street.

There was judgment in favor of Caspar A. Tooke and against Stone and the Muslow Oil Company, Inc., in solido for $6,996.55. Of this amount, in keeping with

stipulations of the parties, $550.72 was decreed to be payable to Maryland Casualty Company, as subrogee, to cover workmen's compensation payments made by it to Tooke. The judgment is silent as to the alleged insurers. The cast defendants appealed.

■ An increase in the award is urged by appellees in brief, but as no answer to the appeal asking for such was filed, no increase may be made by this court.

We experience little difficulty in arriving at what we believe to be the correct state of facts attending this accident. In the main, we find the testimony of both Stone and Tooke to be fair and candid.

A semaphore traffic signal light is suspended over the center of this intersection. In order, and at regular intervals, it displays the colors red, amber and green, the significance of which is well known to everyone. Its importance at this particular intersection is emphasized because of the heavy vehicular and pedestrian traffic thereat. When the red light shows to traffic on Milam street the green or "go" light is in the face of traffic on Marshall street, and vice versa. Nineteen feet south of what would be the south line of Milam street but for the intersection, the city maintains a yellow traverse line across Marshall street, which marks the southern limits of the pedestrian lane. Pedestrians desiring to cross Marshall street at this point are expected to keep on the north side of this line, and Tooke did so.

The trolley bus, going north on Marshall street, stopped to discharge passengers with its north end 3 feet south of said traverse line, and with its right front corner 3 feet or more from the east curb of Marshall street and its right rear corner 5 or 6 feet therefrom. It is 7 feet wide and 22 feet long. Therefore, from the curb to the left front or northwest corner of the bus was at least 10 feet or one-fourth the distance across the street. While the bus was occupying this position, and the green light then being in his favor, Mr. Tooke began the trip across Marshall street. When he had reached the farther corner of the bus he heard a hissing sound emanating from it (air escaping from its cylinders), and thinking that perhaps the bus was in the act of moving forward, he turned to his left (about one-third the way around) to satisfy himself about the bus' movements. It was not moving; he then looked up at the light,

and observing that it showed green to Milam street traffic, resumed travel towards the opposite side of Marshall street. He had covered at least 10 feet of the distance when struck by the left front fender and bumper of defendant's coupé. He testified that as he emerged from in front of the bus he took note of traffic south as far as its rear end, but observed no cars coming. The Stone car was then evidently immediately behind the bus, and due to its position, could not be seen by Tooke. He did not see the offending car until it was so near to him that it could not be dodged.

Stone drove his car to near the rear of the bus after it stopped just below the traverse line. He then veered to his left into the lane of traffic about the center of Marshall street. He testified that before reaching the rear of the trolley he took no note of the traffic light's condition, but that "just a second or less than that after I reached the trolley it turned green. At the time I reached the trolley the light was yellow." He was then asked,—"The light was yellow on Marshall street at the instant you passed the rear end?" To which he answered,—"No. I said somewhere about," and added,—"Just before or just a fraction of a second after I passed the rear end of the trolley, * * * I saw it change from yellow about that time." He further said: "Yes, I was watching the yellow light all of the time."

We conclude from this testimony and that given by Tooke that Stone was at least the length of the bus, 22 feet, from the traverse line when Tooke emerged from the front of the bus. He also testified that he had reduced the speed of his car to 15 miles per hour, had one foot on the clutch and the other slightly against the service brake, as he drove forward and did not observe Tooke until not over 6 feet from him. He says he veered his car to the right as far as he could (in view of the bus' presence, in the hope of avoiding striking Tooke, but without success. We think he is in error in this testimony. No other witness observed any such movement of the coupé. It was stopped within a few feet of the locus of impact, and some witnesses testified that it was then 10 or 12 feet from the corner of the bus. Mr. Tooke was traveling at an ordinary pace across the street, that is, not over 4 miles per hour. Therefore, as the coupé was moving nearly four

times as fast as Tooke, it is safe to conclude that it covered at least 35 feet while he traveled ten feet. It was making 22 feet per second.

It is made certain by Stone's own testimony that he did not reduce the speed of his car after reaching the bus, nor did he perform any other act necessary to bring it under such control that an accident, such as did happen, could be averted if an emergency arose. He continued forward at the rate of 22 feet per second, without taking into consideration the possible presence of pedestrians who might have perempted that part of the intersection which the bus in whole or part obscured from his view. He acted on the assumption that the green light was an absolute guarantee of his right to hurry into the intersection without regard to traffic conditions therein. The law does not afford him the protection in so doing he now contends for. The situation at the time was such as to demand of him the highest degree of care of which he was capable. Had he exercised that sort of care the accident would not have occurred. We are inclined to believe, in fact, do believe, that his eyes were so intensely focused on the light that he saw Tooke only when too late to not strike him. No other explanation of his action seems reasonable.

It is a violation of the traffic laws of the City of Shreveport to drive a passenger car in its business districts in excess of 12 miles per hour. Stone was violating this law when driving at the admitted speed of 15 miles per hour. It is true that this law is generally observed in its breach, but this fact should not and does not detract from its status and effect as a law. Had Stone been observing the speed limitation of the city's law, especially after veering from the rear of the bus, there would have been no collision with Tooke. The violation of a traffic law, it has uniformly been held, is negligence per se. To supply the basis for an action in damages, such violation must be held to be the or a proximate cause of the injury for which damages are sought.

Therefore, we find that Stone was guilty of negligence and carelessness, as a proximate cause of the accident. But for Tooke to recover, we must find and hold that he was free from negligence

as a contributing cause of the accident. We are convinced that the evidence frees him from that charge. We think the favorable green light changed to amber simultaneously with his emergence from behind the bus. The fact that he had reached the center of the street before being struck goes far to sustain this conclusion. Having entered the intersection on a favorable light, he was warranted in continuing the trip across, and to assume that traffic on both sides would respect his superior right of preemption. His right in this respect is vouchsafed by general laws. It is also made secure to him by Section 4 of Ordinance 17 (1926) of the City of Shreveport, which reads as follows:

"Pedestrians who have left the curb and sidewalk at the time the yellow light is first displayed shall proceed as though the green light were on and leave the intersection at once."

Motorists who approach intersections are charged with the duty to vigilantly watch for pedestrians and vehicles caught therein between light changes, and are not warranted in exclusively depending upon a favorable light for the safety of their movements.

The principles of law which, in view of the established facts of this case, encompass Stone's responsibility for the accident, are well settled, and have been enunciated in many cases. Citation of authority in their support appears superfluous.

Appellants' energetic counsel, out of a desire to render the maximum of assistance to the court, as is their custom, have favored us with copious original and supplemental briefs, which discuss elaborately all phases of the case. The principal points of defense argued are:

(1) That the speed of 15 miles per hour of the Stone car at the time and place of the accident was not excessive; therefore, not negligence.

(2) That since Tooke stepped suddenly from in front of the bus and into the path of the Stone car, he was guilty thereby of such negligence as to bar recovery by him, even though it be found that Stone was also negligent.

Whether a given rate of speed of a motor vehicle amounts to negligence or carelessness per se on the part of the

driver depends, as a rule, upon traffic and other conditions on and about the locus. However, it goes without saying that at and in congested centers of a large city, such as intersections, where hundreds of cars and pedestrians pass hourly, a minimum rate of speed should be fixed by law, and then strictly enforced as a precautionary measure for the protection of life and limb. If the lawmaking authority of a city chooses to limit the rate of speed of a motor vehicle at such places to 12 miles per hour no one may with impunity disregard such a law. He who does so acts at his own peril. The wisdom of such a restriction on motor traffic is demonstrated by the facts of the present case.

It is a rule well recognized by the courts of this state that a person may not recover damages for injuries to himself when caused by his suddenly stepping from behind an obstruction to vision and into the path of an oncoming vehicle which runs him down. But this rule, in view of the exceptional features of this case, is not controlling of its issues. In the first place, Tooke did not emerge from in front of the bus at a rapid speed, but was walking at an ordinary pace; in the second place, as found by us, he had a preference right to complete his trip across the street; and, in the third place, he was run down because of the primary negligence of Stone.

Counsel cite and discuss an array of decisions tendered to support their lucid argument on these two points. We have no quarrel with the holdings in these cases but they do not fit the case at bar.

It is true, as charged, that Mr. Tooke's eyesight is impaired. The affection is congenital. However, he travels unassisted in many of the large cities of the United States, and has done so for many years, in connection with his business affairs. This is the first accident of the kind he has suffered. He is quite positive he accurately discerned the traffic light's condition before trying to cross the street.

The specific elements of damages alleged to have been sustained by Mr. Tooke, and sued for, are as follows:

(a) fractures of left leg.........$2000.00
(b) fracture of right arm........ 1250.00
(c) pain and suffering.......... 750.00
(d) permanent loss of use and function of left leg, to extent of 25%.............. 3500.00
(e) permanent loss of use and function of right arm, to extent of 25%............ 1750.00
(f) medical, hospital, x-ray, nursing, medicines, etc......... 1021.55

He was immediately carried from the scene of the accident to the Highland Sanitarium and there remained for sixty days. Physical examination revealed that his body was affected by multiple contusions of a non-serious nature. There was an oblique fracture of the middle third of the humerus, right side, of the right arm, and a transverse impacted fracture of the surgical neck of the same bone. There was also a comminuted fracture of the upper third of the tibia of the left leg, extending into the knee joint. Appropriate treatment of these injured bones was rendered by highly skilled orthopedic surgeons. We are impressed with the belief that satisfactory healing resulted as quickly as could be expected, all things considered. The limbs were placed in casts, etc., for weeks and the body immobilized in order to get the best and quickest results. Very soon jaundice developed, followed by phlebitis. He suffered nausea for about five weeks, loss of appetite, aggravated partially by inability to retain food on the stomach. Dr. Guy A. Caldwell defined phlebitis as being an inflammation in the veins resulting, in this case, in a closure or clotting of blood in one of the principal return flow veins of the thigh, causing a damming back of the blood in the entire leg, and the swelling easily noticeable at time of trial (September 30, 1937). The patient suffered much serious pain and discomfort during his stay in the sanitarium and intermittently thereafter. He remained in bed in his home three or four weeks following discharge from the sanitarium, and used crutches for like length of time after leaving bed. Dr. Caldwell continued to observe him and administer such treatment as the case required until September 10, 1936. At the date of trial the circumference of the injured leg was 1½ inches greater than that of the other one. This condition brings on early fatigue of the limb after use. It will likely disappear in due time if the limb is regularly exercised. In addition to the above enumerated injuries, Tooke suffered serious shock from the impact. He is 47 years of age and has for many years been very active in business affairs in a managerial

capacity. He was able to direct his business operations very well from his sick bed, and at date of trial his managerial ability seemed to be unimpaired, excepting for the recurrence of swelling of the leg after use.

Appellants very briefly discuss the quantum of damages awarded by the trial judge. The subject is dismissed with the statement that the amount is excessive. Of the award, $6,000 was for pain, suffering, and physical injuries. The remainder covered hospital, nurses'· and physicians' bills. We do not think the award excessive.

For the reasons herein assigned, the judgment appealed from is affirmed with costs.